IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 16, 2002

## STATE OF TENNESSEE v. PHILLIP CHARLES SAINDON, JR. and JERRY SAILORS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 96-B-727     Seth Norman, Judge**

---

**No. M2001-01860-CCA-R3-CD - Filed February 14, 2003**

---

The defendants, Phillip Charles Saindon, Jr. and Jerry Sailors, were each convicted of one count of theft over $10,000 and one count of theft over $60,000. In addition to challenging the sufficiency of the evidence on appeal, they argue that there was a fatal variance between the indictment and the proof and that the trial court erred in admitting hearsay evidence. We conclude there was no material or prejudicial variance between the indictment, which alleged theft of United States currency, and the proof as to each was sufficient to sustain the convictions of theft over $60,000. However, as to the convictions for theft over $10,000, we conclude that, although the State presented sufficient evidence to establish that the defendants committed theft of property, the evidence was insufficient to establish the value of the thefts for these convictions. Accordingly, we modify the convictions for theft over $10,000 to theft over $1000 and remand the case to the trial court for appropriate sentencing for this offense. We affirm the judgments of conviction for theft over $60,000.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified and Remanded for a New Sentencing Hearing**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Kenneth Quillen and Michael Flanagan, Nashville, Tennessee, for the appellant, Phillip Charles Saindon, Jr.; and David P. Byrne, Nashville, Tennessee, for the appellant, Jerry Sailors.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Paul DeWitt and James W. Milam, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**<u>FACTS</u>**

The thefts in this case were perpetrated by the defendants against an insurance company, State Auto, which provided insurance coverage on a house that was damaged by fire and a condominium complex damaged by water. Sailors was the independent insurance adjuster hired by State Auto to handle the insurance claims on each property, and Saindon was the building contractor hired to perform the repairs. The proof at trial established that Sailors grossly inflated the estimates of the covered losses at the condominium complex, causing State Auto to issue checks to Saindon for repairs that were neither needed nor performed. Saindon, in turn, gave Sailors a portion of each payment he received from State Auto. The proof with respect to the property damaged by fire was that Saindon accepted and deposited a check from State Auto to cover the full cost of the house's repairs, gave Sailors a portion of that payment, and then failed to complete the repairs, leaving the house in an untenable state. The defendants were able to immediately receive the full amount of the check, without oversight of the mortgagee, because the signature on behalf of the mortgagee was forged.

Gloria McCoy, the owner of the house, testified at the defendants' September 25-27, 2000, trial that the interior of her one-story home in Old Hickory was completely destroyed by a fire that occurred on December 3, 1993. She was told when she contacted State Auto that an adjuster would be sent to assess the damage. Shortly thereafter, Sailors telephoned to tell her that he would meet her at the house and that he would bring several contractors with him. However, when Sailors arrived to inspect the damage, Saindon was the only contractor with him. After the men had inspected the property together, Saindon agreed to perform the repairs.

McCoy and her live-in boyfriend, Jerry Nubell, whom Saindon hired to do some of the work on her house, later met Sailors and Saindon at a Burger King restaurant. There, Sailors gave McCoy a check from State Auto to cover the contents of her house and also handed her a separate check for $45,570 to cover the dwelling itself, made payable to three parties: McCoy; the mortgagee, First Tennessee Bank; and Saindon Enterprises. McCoy testified that her understanding was that the $45,570 check was to cover the entire cost of rebuilding her house. She said that she endorsed the check and gave it to Saindon. McCoy identified her signature on the back of the check and agreed that the check also contained the signature of a "D.S. McCoy," on behalf of First Tennessee Bank. She testified that she did not recognize the name and that none of her relatives worked for First Tennessee.

McCoy testified that Saindon's crew began the repairs on her home, but, after an initial flurry of activity, the work slowed and then stopped completely, leaving the repairs unfinished. She said that the kitchen lacked cupboards and light fixtures and that "[t]here were just different things that needed to be done downstairs." In addition, she said that Saindon "had built an upstairs . . . that wasn't completed at all." McCoy later explained that she had used a portion of her contents check to hire Saindon to build an upstairs addition on the home, which had originally been one-story. When she contacted State Auto about the incomplete repairs, she learned that they were under the impression that the job had been finished. She subsequently sued Saindon in civil court, obtaining

-2-

a judgment of over $8000.[1] State Auto eventually hired another contractor to do further work on her home, but the entire repairs were never completed. On cross-examination, McCoy testified that her lawsuit had involved the entire house, including the work Saindon left unfinished on the second floor. She acknowledged she had not named Sailors as a party in the civil suit and that she had been satisfied initially with the services he performed.

McCoy's former boyfriend, Jerry Nubell, testified that Saindon hired him at the rate of approximately $10.50 per hour to do some of the work on restoring McCoy's house. Nubell said that Saindon originally assigned a member of his crew to work with him, but "[t]hings kind of thinned out after [they] got everything tore up and cleaned out, as far as help wise." According to Nubell, Saindon failed to pay him regularly for the 100 plus hours he estimated he spent working on the house. He said he was present at the Burger King when McCoy endorsed the check for the repairs to her house and saw her hand the check back to the defendants while still at the restaurant.

George Duzane, the attorney who handled McCoy's civil suit against Saindon, testified that Saindon acknowledged in a deposition that he had deposited the $45,570 check from State Auto into his checking account. The deposition, which was made an exhibit in the case at bar, also contains Saindon's acknowledgment that he had agreed to accept the insurance coverage of $45,570 as full payment for restoring the home to its original condition. On cross-examination, Duzane testified that Saindon stated in his deposition that he had given the check to Nubell, who had brought it back to him the next day with the bank's endorsement.

Becky Bassett, a residential loan officer at First Tennessee Bank, testified that the bank's endorsement on the back of the check made payable to McCoy, Saindon, and First Tennessee was not legitimate. The check was endorsed "D.J. McCoy, Assistant Vice President,"[2] but the bank had never had an employee by that name. Moreover, the endorsement on the check was printed, rather than stamped in the customary manner of the bank. Bassett testified further that First Tennessee's established procedure would have been to deposit the funds into a "loss draft fund account" attached to the loan and to pay out certain amounts from that account only as the work was completed and inspected.

Charles Larry Winters, the plant supervisor for State Auto Insurance Company, testified that the company regularly hired independent adjusters, such as Sailors, when the company's internal adjusters were unable to handle a claim.[3] He assigned Sailors to handle the McCoy claim after receiving the loss accord on the property on December 6, 1993. Winters did not become involved

---

[1] The attorney who handled McCoy's civil suit against Saindon testified that the judgment was for $8,596.

[2] We note that Gloria McCoy testified that the bank's endorsement on the check read "D.S. McCoy." The copy of the check included in the record on appeal is illegible; therefore, we are unable to ascertain whether the signature was that of "D.J. McCoy" or "D.S. McCoy."

[3] Winters said that a severe winter storm that occurred about the time of the McCoy fire resulted in an unusually large number of claims.

in the case again until October of 1994 when he received a telephone call from either McCoy or her attorney informing him that the repairs had not been completed. During his subsequent investigation, Winters obtained a copy of the estimate Sailors had prepared on the McCoy property, which included both the "scope," *i.e.*, a line itemized determination of the needed repairs, and the pricing. The bottom line estimate of the cost of the repairs was $55,260. The estimate was signed by Sailors and contained the notation, "Agreed: Saindon Enterprises by Mr. Phillip Saindon, Jr." Winters testified that State Auto, at Saindon's request, issued a check in the amount of $45,570 to cover the dwelling itself, which represented the limits of the policy.[4] Winters testified that Sailors was paid on a time and expense basis and identified a check for $1,135.10 that State Auto issued to Sailors as payment for his services in handling the McCoy claim.

Winters inspected McCoy's house on November 10, 1994. At that time, he found the house "a mess" and "in a terrible state of disrepair," both inside and out. Winters testified that the house had no working heating system and lacked some of the shingles on the outside walls. Underneath the house, he saw burned and charred floor joists that had been "sprayed with a silver paint as a protective thing." Because it was cold weather and Ms. McCoy had small children, Winters paid another contractor $3000 to at least make the house tenable even though, in his opinion, State Auto had already satisfied its obligations on the claim.

Jeannie Venditto, the records custodian for SunTrust Bank,[5] testified that on January 7, 1994, a $45,570 check drawn on State Auto's account was deposited into the checking account of Saindon Enterprises, with $5500 immediately withdrawn in cash, leaving a net deposit of $40,070. On January 8, 1994, a $5000 check drawn on Saindon Enterprises' account was written to Jerry Sailors, and on January 10, 1994, the funds from that check were deposited into Sailors' account at the bank. Veteran independent insurance adjuster John Braniff testified that insurance companies compensate independent adjusters on either a fee schedule or time and expense basis. He said that an independent adjuster does not normally receive compensation from any other source; during his ten years as an independent adjuster, he had never received payment from a contractor for a claim he had handled.

The second property involved in this case was Montclair Condominiums in Nashville, where burst water pipes caused flooding in several condominiums. Steve Ghertner, the managing agent for the complex, testified that in early January 1994, a sprinkler head burst at the complex, damaging six of the units, and an additional two units were damaged by an unrelated plumbing problem. Through Ghertner's testimony, the State introduced a number of checks State Auto had issued to cover the repairs. Ghertner testified he endorsed three of the checks that were made jointly payable to the condominium association and different contractors. Five others, in the amounts of $24,541.20, $47,458.79, $39,547.40, $42,495.86, and $27,434.16, each of which was made payable to the

_____

[4]As stated previously, Saindon acknowledged in the deposition he provided in the civil suit that he had agreed to accept the insurance coverage on the property as full payment for performing the repairs listed in the estimate.

[5]Venditto testified that SunTrust had several years earlier acquired the assets and records of Third National Bank, where Saindon and Sailors held accounts.

condominium association and Saindon Enterprises, had been endorsed by a "Brad Johnson" on behalf of the condominium association. No one by that name was connected with the condominium association, and Ghertner had no memory of having ever seen those checks. However, he thought he remembered Sailors having explained that he had arranged with State Auto to handle the payments to Saindon himself, so that Ghertner would not need to be involved.

Ghertner acknowledged having signed five proof of loss statements corresponding to each of the five checks State Auto had issued to Saindon Enterprises and the condominium association. He explained, however, that the statements were filled out prior to his signature, covered damage to multiple units, and did not list each specific unit covered. He said that the insurance adjuster handled the claims, and he had not gotten involved in the details of the repairs. He did not go into the units after his inspection of the initial damage. The only work he recalled having been done on the exterior of the building was some painting on the breezeway ceilings; he did not see any masonry work done to the outside of the building.

The owners of five of the condominium units State Auto paid Saindon Enterprises to repair testified on behalf of the State. Each confirmed having spoken to the investigator hired by State Auto and having informed him of the repair work that was not done. Each was also asked to compare the repairs listed on the "Sailors and Company" estimates with the work that actually had been performed. Peggy Flynn, who owned unit 207, testified that although an insurance adjuster came to inspect the premises, no damage occurred to her condominium and no repairs were ever performed.[6] Dr. Mark Levitch, owner of unit 307, testified that two men came to inspect his unit, one introducing himself as an insurance adjuster and the other saying that he was the head of a construction company. Dr. Levitch testified that the damage to his condominium was confined to the parquet floor, baseboards, and wall in his foyer. The following repairs, listed on the estimate, were not performed: sheetrock was not replaced in the living room; crown molding and baseboards were not replaced; wallpaper was not replaced; vinyl kitchen flooring was not replaced; and the living room ceiling was not reinsulated or replaced. Collins Hooper, who lived in unit 107, testified that an insurance adjuster came to inspect her unit, but very little damage had occurred. She did not know if any crown or base molding was replaced in her condominium; she believed, however, that none needed replacing. There was no parquet flooring in her unit, and no debris had needed to be hauled away. No damage had occurred in the closet, and she was unaware of any work having been performed there. Holly Conner, the owner of unit 201, testified that most of the damage to her condominium occurred in the living room, third bedroom, and guest bath. Asked to compare the repairs listed on the estimate to the work that had actually been performed, she testified that no carpet was removed or replaced in her living room or powder room, and she had never had any wallpaper in her condominium. Finally, Fleming Wilt, the owner of unit 308, which suffered the most extensive damage, testified that his condominium had an open air balcony where very little damage had occurred. Thus, none of the many repairs attributed to his "enclosed balcony," with the possible exception of replacing the carpet, had been performed. In addition, no repair work was

---

[6] State Auto's investigator, Allen Richards, later testified that the only work performed on Flynn's condominium was painting of the front door.

needed or performed on the ceramic of his jacuzzi. He did not see any work performed on the exterior of the building, either.

State Auto Senior Claims Representative Harold Warner testified that Sailors appraised the damage to the condominiums and requested the following amounts to pay for repairs: $6,539.94 for unit 307; $3,801.50 for unit 207; $7,468.58 for unit 301; $6,967.18 for unit 201; $15,681.08 for unit 107; $34,028.90 for unit 108; $37,811.24 for unit 208; and $42,495.86 for unit 308. Sailors requested a check in the amount of $27,434.16 to pay for the damage to the exterior and common areas of the condominiums. Warner testified that he had relied on Sailors to perform an accurate and honest appraisal of the damage and had not inspected the building himself. He conceded on cross-examination that he had sworn proof of loss statements for each claim, that Sailors provided photographs to substantiate the estimate appraisals, and that a claims adjuster and the home office had reviewed and approved the claims before State Auto issued the checks covering the repairs.

Subsequently, State Auto assigned Allen Richards, a former claims supervisor for the company, to investigate whether Sailors inflated the estimates for the repairs to Montclair Condominiums. Richards testified that he spoke with all eight condominium owners and the managing agent during the course of his investigation. By "reverse calculat[ing]," or adding up the prices listed on the detailed estimates for work that the owners and agent said was not performed, he arrived at $98,930.47 as the total amount State Auto paid for repairs that were not done. Richards testified that he did not question the price charged for completed work, and he did not include the cost of repairs for those situations in which the owners expressed uncertainty about whether the work had been performed.

Richards' subtotals for the undone repairs in each individual unit and in the common areas and facade were as follows: $15,976.10 for unit 308 (Fleming Wilt); $18,592.65 for unit 108; $10,716.59 for unit 107 (Collins Hooper); $4,501.55 for unit 307 (Dr. Mark Levitch); $3,651.50 for unit 207; $2,736.74 for unit 201 (Holly Conner); $17,539.11 for unit 208; $4,289.91 for unit 301; and $20,926.32 for the common areas and facade of the building.[7] Richards testified that the total amount State Auto paid for repairs at the condominiums was approximately $198,000.[8]

Richards stated that he held face-to-face interviews with all but three of the condominium owners – Ms. Day, who did not testify at trial, of unit 301, as well as Ms. Flynn and Ms. Conner,

---

[7]Saindon asserts in his brief that the total amount charged for the allegedly undone repairs was only $94,841.33. To arrive at this figure, Saindon uses $15,493.87 as the amount overcharged for unit 108. However, although Richards initially testified that the undone repairs for unit 108 totaled $15,493.87, he immediately offered a correction, testifying that the total, including the overhead and profit factor charged, was actually $18,592.65.

[8]By our calculation, the five checks State Auto issued to Saindon and the condominium association total only $181,477.41. Therefore, we think it likely that the $198,000 figure Richards quoted as the amount State Auto paid for repairs at the condominium included the cost of work performed by other contractors. However, since Richards arrived at the value of the unperformed repairs charged by Saindon by, as he termed it, "reverse calculation," the total amount State Auto paid for repairs at the condominium is irrelevant.

both of whom did testify. He met Fleming Wilt, Greg Chappell, Mark Levitch, and Collins Hooper in person at their respective condominiums, where they each pointed out to him the repairs that had been performed. He saw nothing in their units to contradict the accounts they provided of the work that had not been done. Richards agreed on cross-examination, however, that his direct examination testimony was "all based entirely upon what other people had told [him]," and he had no personal knowledge of which repairs had not been performed.

As its final witness, the State recalled Jeannie Venditto, the records custodian for SunTrust Bank. Through her testimony, the State introduced evidence that the following checks from State Auto were deposited into Saindon's account at SunTrust Bank on the following dates: a check for $24,541.20 written on February 8, 1994, and deposited on February 9, 1994; a check for $47,458.79, written and deposited on February 18, 1994; a check for $39,547.40 deposited on March 11, 1994; a check for $42,495.86 deposited on March 31, 1994; and a check for $27,434.16 deposited on May 4, 1994. The following eight checks, drawn on Saindon's account, were deposited into Sailors' accounts at the bank: a $3000 check dated and deposited on February 9, 1994; a $9000 check dated and deposited on February 18, 1994; a $6000 check dated February 21, 1994, although apparently deposited on February 18, 1994; a $400 check dated and deposited on March 2, 1994; a $3000 check dated March 30, 1994; a $5000 check dated and deposited on March 11, 1994; a $5000 check dated May 23 and deposited on May 21, 1994; and a $3500 check dated May 24 and deposited on May 23, 1994, for a net deposit to Sailors' accounts of $34,900. Several of the deposits to Sailors' accounts at the bank occurred on the same day that State Auto's checks were deposited into Saindon's account, with at least one of the deposits into Sailors' account having been made within minutes of the deposit of a State Auto check into Saindon's account.

The trial court denied the defendants' motions for judgment of acquittal, and both rested without presenting any proof. Following deliberations, the jury found the defendants guilty of one count of theft over $10,000, a Class C felony, and one count of theft over $60,000, a Class B felony. The trial court sentenced each defendant as a Range I, standard offender to concurrent terms of eight years for the theft over $60,000 conviction and three years for the theft over $10,000 conviction, with the sentences to be suspended and the defendants placed on probation after service of fifty-two consecutive weekends.

## ANALYSIS

### I. Variance between Indictment and Proof

The defendants contend there was a fatal variance between the indictment, charging them with theft of "United States currency," and the proof, which showed theft of checks. Saindon asserts that the generic theft statute he was charged with violating "fails to give a defendant adequate notice of the charges against him and, in conjunction with a material variance in the description of the alleged stolen property, may well be deceptive." Sailors adopts the same argument and asserts that by specifically charging theft of United States currency, the State adopted the burden, which it failed to meet, of proving theft of currency. The State asserts that theft of currency was shown by proof

that the defendants deposited State Auto's checks into their bank accounts. The State argues, further, that any variance that may exist was not material, pointing out that the defendants were provided with copies of the checks in discovery and thus could not have been surprised by their introduction at trial.

Before a variance will be deemed fatal to a prosecution, it must be both material and prejudicial. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). In Moss, our supreme court set forth the following test for determining when a variance will be deemed fatal:

> Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

Id.

Applying the Moss test, we conclude that any variance that may be said to exist in this case was not fatal and, therefore, constitutes harmless error. The indictment informed the defendants that they were charged with a theft in Davidson County beginning on or about December 9, 1993, of property belonging to State Auto consisting of United States currency of the value of more than $10,000 but less than $60,000; and of a theft in Davidson County beginning on or about January 6, 1994, of property belonging to State Auto consisting of United States currency of the value of more than $60,000. At trial, the State showed that Saindon deposited checks from State Auto into his account at SunTrust Bank, thereby converting them into United States currency. From that same account, Saindon then wrote checks to Sailors, which Sailors in turn deposited into his accounts at the bank. Although Saindon asserts that there was a material variance between the indictment and the proof and that such variance "may well [have] be[en] deceptive," neither defendant alleges that they were actually surprised or prejudiced by the proof at trial, or that the wording of the indictment prevented them from preparing an adequate defense. Moreover, the indictment, combined with the record in this case, is sufficient to prevent the defendants from further prosecution for the same offenses.

As supplemental authority on this issue, Saindon submitted a recently published opinion, State v. Goodson, 77 S.W.3d 240 (Tenn. Crim. App. 2001), in which this court concluded that an indictment charging a defendant with driving on a revoked license impermissibly varied from the proof, which showed that he drove on a suspended license. Id. at 241. The variance in that case was found to be fatal because driving on a revoked license is a separate and distinct offense from driving on a suspended license, the offense that was proved at trial. Id. at 245-46. Such is not the case here. The indictment, alleging theft of United States currency belonging to State Auto, is essentially the

same as the proof that was presented at trial. "A variance between an indictment and the proof in a criminal case is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." Moss, 662 S.W.2d at 592. In the present appeal, there is no claim that the assailed language of the indictments misled the defendants as to the charges against them or subjected them to double jeopardy. We therefore conclude that this issue is without merit.

## II. Hearsay Testimony

The defendants contend that the trial court erred in allowing Allen Richards to testify regarding the value of unperformed repairs at the condominium complex, arguing that his testimony was based on inadmissable hearsay. The State responds by arguing that because five of the condominium owners and the managing agent testified at trial, and Richards personally visited two of the non-testifying owners' units, the only portion of Richards' testimony that was based on inadmissable hearsay was that with respect to the undone repairs in Diane Day's unit. The State further argues that any error in admitting that testimony was harmless since the total cost of undone repairs at the condominium, excluding those in Day's unit, still exceeds $60,000.

This issue first arose towards the beginning of Richards' direct examination testimony, as he was being questioned by the State:

> Q    And did you eventually talk to eight unit owners and Mr. Ghertner, the representative of the homeowners association?
>
> A    Yes.
>
> Q    And from talking to those individuals, those people, did you learn that there was a pattern . . .
>
> MR. QUILLEN:  Objection.
>
> Q    Okay, I'll rephrase that.  From talking to these people did you learn that there were items put forth on the estimates that were not repaired?
>
> MR. QUILLEN:  Objection, Your Honor.  That obviously calls for hearsay.
>
> GENERAL DEWITT:  Your Honor, I would submit that it's merely a prior consistent statement that the previous witnesses described.

THE COURT:   I'll overrule the objection.

GENERAL DEWITT:

Q      You may answer the question.

A      Yes, sir, I did.

Asked specifically to whom he had spoken, Richards identified the property manager by name and the eight condominium owners by reference to the numbers of their condominium units. He was then asked to explain the process he had followed to arrive at his calculations for undone repairs, and the following exchange occurred:

> Q      All right.  And did you calculate, by adding all the items that they said were not repaired, calculate a figure?
>
> A      Yes, on each unit.
>
> Q      And what did that figure represent?
>
> A      As we went through, or as I sat and spoke with the people, I went line by line down the estimate.  And based on what they told me, whether it was or was not done, those items were marked.  If they did not know whether it was done, or not, or if there was any question in their mind, I did not mark it.   I wanted to know what they knew.  Obviously, I had not seen it myself.
>
> In doing so, that is how we added it up.   There were no adjustments, if you will, made to any items that were done.  We didn't question unit prices.  In other words, if they said they put up wallpaper at so much a roll, that wasn't questioned, as long as the owner said yes, it was there.  And that is how those figures were arrived at.

Richards subsequently testified regarding his calculation of undone repairs not only in the units belonging to the five testifying owners and in the common areas of the building, but also in the three units belonging to condominium owners who did not testify at trial.  The subsequent testimony of Richards is set out in twenty-four pages of the trial transcript.  There were no objections to any of the questions or answers in these twenty-four pages, nor to the nine exhibits entered into evidence during this testimony. At the conclusion of this portion of his testimony, however, the defendants objected, moving that Richards' entire testimony be stricken from the record:

Your Honor, I move to strike the testimony of this witness because it's based in part on hearsay from witnesses who have not testified, and Greg Campbell has not testified and Diana Day has not testified. Some of his testimony is based on what interviews that he says he had with those people. We've had no opportunity to cross examine them. My motion is to strike his testimony in its entirety.

The State responded that the defendants should have raised "a contemporaneous objection" to this testimony, and the trial court agreed, overruling the defendants' motion to strike. As we understand the defendants' arguments on appeal, the trial court should not have allowed the witness to testify as to calculations even of the five condominium owners who testified, because of the earlier hearsay objection.

In assessing these arguments, we will review first the hearsay objection which followed the question, "From talking to these people[,] did you learn that there were items put forth on the estimates that were not repaired?" We note that this question is a rephrased version of the previous question, which referred to conversations of the witness with eight condominium owners and the manager. Thus, "these people" in the State's question appeared to refer to nine persons. The State, in responding to the hearsay objection, reminded the court that the witness would be relating the prior consistent statements of three of the condominium owners who had testified previously in the trial. However, the other six of "these persons" had not. What the State was seeking from the witness was indirect hearsay, the nature of which is explained in Neil P. Cohen et al., Tennessee Law of Evidence, §8.01[11][b] (4th ed. 2000), utilizing an example:

> Sometimes witnesses, especially police, are tempted by lawyers to get in hearsay through the back door.
>
> Q. After talking to the informant–and don't tell the jury what the informant told you–what did you do?
>
> A. I went to the luggage room, found the red suitcase with the defendant's name on it, and found cocaine inside.
>
> Most jurors will get the message intended from this indirect hearsay. They will have learned what the informant said, even though no words from the informant were actually repeated. The testimony is hearsay and inadmissible; courts should close such back doors. This testimony should be permitted only if the effect on the listener is somehow relevant. For example, in the above hypothetical if the issue is whether the officer had probable cause to search the suitcase in the luggage room, the evidence would not be hearsay. It would be used to prove the effect on the listener, not the truth of the informant's statement.

At trial, the apparent intended, but unstated, purpose for the State's question was to explain why Richards continued with his investigation. We respectfully disagree with the State's rationale at trial that the statement was admissible because Richards was testifying as to hearsay statements made by previous trial witnesses. In fact, as we have stated, by the point in the trial when this question was asked, only three of the condominium owners had testified, while the statement appears to encompass statements of all of the eight owners. However, applying the rationale explained by Tennessee Law of Evidence, we believe that the statement arguably was intended to prove its effect on Richards, that he continued with the investigation. As such, we conclude that the statement was not hearsay.

As to Richards' testimony, the defendants assert on appeal that this unsuccessful objection as to indirect hearsay remained vital through the ensuing twenty-four trial transcript pages of his testimony, during which nine exhibits were introduced, enabling the defendants, by their view, then to move to strike his testimony, and presumably the exhibits, in their entirety. As we will explain, we respectfully disagree with this argument.

First, we note Richards' hearsay detailing of repairs neither needed nor performed at the condominium units was testified to by six of the declarants themselves, consisting of five owners plus the manager. The fact that six of the hearsay declarants testified does not mean that Richards was not testifying to hearsay in recounting his conversations with them. See Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[11][c] (Supp. 2002) (explaining "that the normal hearsay rules still apply to the witness's earlier statement" even though the witness-declarant subsequently testifies). However, we would elevate form over substance if we concluded that reversible error resulted from Richards' testifying as to his conversations with witnesses who, themselves, testified at trial as to the same information. See Hitt v. State, 53 S.W.3d 697, 708 (Tex. Ct. App. 2001) ("Overruling an objection to evidence will not generally result in reversal where other evidence of that same fact was received without objection[.]").

We next will consider the defendants' claims as to Richards' relating what the three non-testifying condominium owners told him about undone repairs. As we have stated, the defendants made no subsequent objections to any of Richards' testimony, following the initial indirect hearsay objection, nor to the exhibits introduced through him. Although the trial court overruled the initial hearsay objection, the court was not given the opportunity to consider objections to any of the ensuing testimony or exhibits, for none were made. While we agree that a motion to strike may be made at the conclusion of a witness's testimony, as occurred when the direct examination of Richards had been concluded, we agree with the trial court's ruling that the motion, under these circumstances, was untimely. The function of a motion to strike is explained in Neil P. Cohen et al., Tennessee Law of Evidence, §1.03[4][c] (4th ed. 2000):

> Although on most occasions an objection rather than a motion to strike is used, Rule 103(a)(1) sometimes dictates the latter procedure. A motion to strike, which is essentially a delayed

objection, is used frequently when evidence has been conditionally admitted, and the condition is not later fulfilled. This motion should be made by counsel opposing the evidence. A motion to strike is also appropriate any time inadmissible evidence has been heard by the trier of fact. It may be accompanied by a request for a jury instruction to ignore the evidence.

Thus, it is appropriate to utilize a motion to strike when, for example, the State has not sufficiently established the chain of custody by the time the last witness as to that issue has testified. See State v. Dean, 76 S.W.3d 352, 367-68 (Tenn. Crim. App. 2001), perm. to appeal denied (Tenn. 2002). By contrast, in the present appeal, the complaint was not as to evidence conditionally admitted but presented, instead, after the witness had testified at length as to hearsay conversations with nine persons. In fact, at least three categories of hearsay evidence came into the record during the testimony of Richards: (1) hearsay testimony regarding conversations with six witnesses who, themselves, testified at the trial; (2) hearsay testimony regarding conversations with three witnesses who did not testify; and (3) records prepared by one of the defendants, the use of the records based, in part, upon the hearsay conversations. By relying upon their initial objection to hearsay testimony by Richards, which we have determined was not well taken, and allowing twenty-four transcript pages of testimony and nine exhibits to come into evidence before making a second objection to hearsay and then asking that all of the testimony be stricken, the defendants have given us the impossible task of sorting through each question, answer, and exhibit to identify the hearsay arguably encompassed by the objection and determining, then, whether it might have been admissible through an exception to the hearsay rule. However, we respectfully decline to do so, instead concurring with the ruling of the trial court that the defendants' second hearsay objection was untimely.

### III. Sufficiency of the Evidence

Both defendants argue that the evidence was insufficient to sustain the conviction as to either count. As to count one, Sailors argues that "the most Jerry Sailors could be guilty of is poor judgment and perhaps ethical impropriety in taking $5,000.00 from the contractor in this case." Saindon argues that this count "is based on nothing more that [sic] a business deal gone bad. It was doomed from the start."

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754

S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendants were alleged to have violated Tennessee Code Annotated section 39-14-103, which provides that "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." The broad reach of this statute was explained in State v. Amanns, 2 S.W.3d 241, 243-44 (Tenn. Crim. App. 1999) (footnote omitted):

> In enacting a consolidated theft statute, "the objective is to define the crime broadly enough to include all vaguely separated theft offenses so that evidence of appropriation by any of the forbidden methods will support the charge." State v. Saylor, 228 Kan. 498, 618 P.2d 1166, 1170 (1980); see also MODEL PENAL CODE § 223.1 (1980). Like charity, Tennessee's definition of theft covers a multitude of sins. The distinction between the various theft offenses is unimportant; the crime is complete when a person takes property, without the owner's consent with the intent to deprive the owner of the property. Thus, the charge of theft may be supported by proof of embezzlement, false pretense, fraudulent conversion and other statutory forms of larceny existing prior to the enactment of our current offense of theft. See Tenn. Code Ann. § 39-14-101 (1991).

The defendants' claims of insufficiency of proof for count one, the allegations of which were based upon payments made by State Auto Insurance for repairs to McCoy's residence, overlook several important facts. First, the $45,570 check from State Auto Insurance dated January 7, 1994, payable jointly to McCoy, First Tennessee Bank, and Saindon, and bearing a forged endorsement

of First Tennessee Bank was deposited into Saindon's account on January 7, which was a Friday. Three days later, on Monday, January 10, a $5000 check from Saindon Enterprises dated January 8, 1994, and payable to Sailors, was deposited into Sailors' account. The forged endorsement of First Tennessee Bank, the mortgagee, on the State Auto check enabled Saindon to receive immediately the full amount of the check rather than having it disbursed by the mortgagee only as work was done. From this proof, a reasonable jury could have concluded that the defendants committed theft against State Auto Insurance. However, we agree with the defendants that the State failed to prove that the amount stolen exceeded $10,000, as had been charged. Although the descriptions of the house as abandoned by Saindon was that much work was undone, we cannot equate that fact with a specific amount. Likewise, we cannot assume that the amount of the civil judgment obtained by McCoy against Saindon necessarily translates into the amount of the theft from State Auto. However, we agree with the State that the $5000 sum received by Sailors from Saindon from the proceeds of the State Auto check for repairs to McCoy's house establishes that the amount of the theft was at least this sum. Accordingly, we modify both defendants' convictions of theft over $10,000, a Class C felony, as charged in count one, to theft over $1000, a Class D felony. We remand for a new sentencing hearing as to count one.

As to count two of the indictment, the defendants argue also that the State did not prove that the amount of the theft exceeded $60,000. Their argument is bottomed upon the fact that if the amount of the undone repairs to units 108, 208, and 301, the units belonging to owners who did not testify at trial, is subtracted from the total, the total amount State Auto paid for undone repairs is less than $60,000. While we agree with the defendants' calculation, we disagree with their argument. As we have previously determined, the trial court did not err in allowing the testimony of Richards as to the repairs paid for but undone as to the units because a timely objection was not made to this testimony. Thus, the evidence was sufficient as to the conviction of each defendant for theft over $60,000, as alleged in count two of the indictment.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we modify the judgments of conviction for count one as to both defendants, reducing the convictions to Class D felonies, and remand for a new sentencing hearing. As to count two, we affirm the judgments of conviction as to both defendants.

_____
ALAN E. GLENN, JUDGE

-15-